UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUENTIN M. BROWN, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>APL MARINE SERVICES, LTD., et al.,<br><br>   Defendants. | Case No. 22-cv-06999-DMR<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 82 |

Plaintiff Quentin M. Brown brings this complaint against Defendants APL Marine Services, LTD ("APL") and Yasin Berber. APL filed a motion for summary judgment solely as to Brown's claims against APL. [Docket No. 82 (Mot.).] Brown opposes. [Docket No. 88 (Opp'n).][1] The court held a hearing on August 8, 2024. For the following reasons, APL's motion for summary judgment is granted in part and denied in part.

**I.   FACTUAL BACKGROUND**

The following facts are undisputed, unless otherwise noted.[2]

Brown was employed by APL from November 21, 2021 through January 10, 2022 as a seaman aboard the M/V PRESIDENT WILSON (the "Wilson"). [Docket No. 88-1 (Decl. Carlos F. Llinas Negret, June 28, 2024) ¶ 5(g); 20(a).] Specifically, Brown worked as a wiper in the ship's Engine Department. *Id.* at ¶ 4(c); 7(f). Brown's job duties included cleaning in the engine room, loading stores and provisions, and providing other forms of assistance. [Docket No. 88-12

---

[1] Brown's opposition, excluding caption page and tables, is 32 pages long. Local Rule 7-4(b) states that the opposition brief may not exceed 25 pages unless the court expressly grants permission to do so. The court will consider the full opposition but cautions Brown to comply with all rules, including the local rules and this court's standing orders, or risk the imposition of appropriate sanctions.

[2] The court discusses additional facts below where relevant to its analysis.

(First Dep. Quentin M. Brown, Feb. 9, 2024) 34:23-25.] Brown was one of two wipers employed on the Wilson. *Id.* at 35:1-9.

Defendant Yasin Berber was employed by APL as a reefer technician during the relevant time period, and also worked in the Wilson's Engine Department. Llinas Decl. ¶ 4(d); 7(f). As reefer technician, Berber's job duties included monitoring the refrigerated cargo, the air conditioning compressors, and the distribution of steam-heated or refrigerated air throughout the vessel. [Docket No. 88-9 (Dep. Paul Hudson, April 5, 2024) 26:3-19.] Reefer technician is a higher rank than wiper; a reefer technician may request assistance from wipers for tasks, but does not supervise the wipers. *Id.* at 35, 37-38.

Brown and Berber's immediate supervisor was First Assistant Engineer Juan Carlos Roberts. First Brown Dep. 36:3-6; [Docket No. 84 (Decl. Joel C. Spann, May 23, 2024) ¶ 11(a)-(b)]. Brown and Berber were also supervised by Chief Engineer Paul Hudson and Captain Paul Sallee. Llinas Decl. 4(f), (k).

During the relevant time period, the Wilson's Safety Management System included mandatory policies and procedures concerning prohibited conduct aboard APL vessels, including sexual harassment and sexual assault. Llinas Decl. ¶ 7(q). Per APL policy, any supervisor or officer who became aware of possible sexual harassment had to promptly advise the captain; this reporting obligation existed even if the person being harassed requested that no report be made. [Docket No. 88-8 (Dep. Matthew Cleary, April 26, 2024) 122:19-123:6.]

According to Brown, during a 9-10 day crossing from Oakland to Japan he was a victim of harassment from Berber which culminated in a sexual assault on December 2, 2021. First Brown Dep. 31:5-15; 63:11-15. Brown describes four incidents that preceded the sexual assault. A few days after the ship sailed from Oakland, at the ship's Mess Hall during dinner time with most of the crew around, Berber gave Brown "a very uncomfortable stare" for approximately 30 seconds. *Id.* at 46:11-48:5. One or two days after that, Berber made Brown feel uncomfortable by "staring at [his] butt" as Brown walked away from him. *Id.* at 49:16-19. A day later, at the Coffee Room on the Sailors' Deck, Berber placed himself in front of a doorway blocking Brown's movements, staring at Brown and winking at him once. *Id.* at 52:12-54:1, 54:20-55:2. Brown was forced to

2

1   "step up and move" and "slither by" Berber to get into the Coffee Room. *Id.* at 53:14-17. After

2   this incident, Brown told another employee, Mohammed Abduladula, that Berber was winking at

3   him. *Id.* at 84:3-8. Finally, at the ship's Mess Hall during breakfast time, Berber sat directly

4   across from Brown approximately 10 to 15 feet away and made "sexual faces, like puckering his

5   lips," winked at Brown, and "blew a kiss" at him. *Id.* at 56:15-22, 59:1-23. In response, Brown

6   yelled, "What the fuck." *Id.* at 56:24. Another employee who was sitting next to Brown,

7   Alexander Reyer, started laughing and saying, "Wow, wow, wow." *Id.* at 57:14-17. Berber

8   replied, "What? I'm just eating. I just woke up. What's wrong with this guy." *Id.* at 57:19-23.

9   Brown left the Mess Hall without finishing what he was eating. *Id.* at 58:1-3.

10   According to Brown, Berber sexually assaulted him two or three days later, on December

11   2, 2021. *Id.* at 62:8-24. Brown was working in the machine shop, along with four other

12   employees including First Assistant Engineer Juan Carlos Roberts and Wiper Eddi Coloma. *Id.* at

13   24:6-25:4. Berber walked into the machine shop and then "pretended to be off balance from the

14   ship's rolling." *Id.* at 27:5-11. He "slammed into" Brown and Coloma. *Id.* at 30:4-9. He put his

15   right arm around Coloma and smiled at him, and with his other hand, he ran his hand down

16   Brown's back, reached into Brown's pants, and inserted a finger into his anus for about a second.

17   *Id.* at 21:2-20, 30:4-31:16. He then "ripped his hand out of [Brown's] pants and something

18   scratched [Brown]." *Id.* at 31:11-14. Brown did not say anything at the time. *Id.* at 71:8-13. He

19   pulled up his pants and turned around. *Id.* at 32:8. Berber interacted with the other employees and

20   then left the machine shop. *Id.* 32:11-33:14. Nobody commented on the incident at the time, and

21   Brown is unsure if anyone witnessed it. [Docket No. 84-4 (Second Dep. Quentin M. Brown,

22   March 7, 2024) 364:20-365:20.] Later that day, Brown found blood coming from his rectum.

23   First Brown Dep. 56:5-18.

24   Around 5:30 p.m. on the same evening, Berber partially blocked Brown's path again. He

25   "wiggled his hips while making sexual facial expressions" and licking his lips. [Docket No. 88-16

26   (Brown Email Statement)]; First Brown Dep. 67:9-17. Brown told him to go away, and Berber

27   complied. First Brown Dep. 68:1-4. Berber then returned and asked to speak with Brown. *Id.* at

28   68:7-8. They went to the Change Room and Brown had a heated confrontation with Berber, in

3

which he told Berber to leave him alone. *Id.* at 69:3-70:12, 74:4-75:11. Two or three hours later, Brown saw Berber crying. *Id.* at 70:14-71:7.

The next morning, on December 3, 2021, Chief Engineer Paul Hudson took Brown aside and asked him what had happened with Berber. *Id.* at 89:14-22. Brown replied that Berber had been coming on to him, but did not describe any specifics of the previous harassment or the assault. *Id.* at 89:22-91:22. From here, Brown and Hudson's accounts differ. According to Brown, Hudson simply said, "In that case I'll have to file a sexual harassment report," and walked away. *Id.* According to Hudson, he told Brown that he would ensure Brown and Berber would not have to work together and that if Brown wanted to, they could go to the captain and formally create a report, but Brown said he would not be making a report. Hudson Dep. 171-172. Hudson verbally informed Captain Paul Sallee about his conversation with Brown that same day. *Id.* at 172-173.

On December 14, 2021, when the Wilson had arrived in Asia, Brown called his union vice president Deyne Umphress and explained the situation, again without mentioning the assault. *Id.* at 94:22-12, 99:23-100:10. Umphress told him to get the sexual harassment report from Hudson. 94:11-12. According to Brown, he went to Hudson's office and asked if he had filed the sexual harassment report. *Id.* at 100. Hudson replied, "What report?" *Id.* Hudson then said he did not know how to create the report, but that he could "scribble something," and that he would have to get the captain (Paul Sallee) involved. *Id.* at 100-101. Hudson also told Brown he had talked to Berber and believed the issue was resolved. *Id.* at 101:5-9. Brown said, "Forget it," and left. *Id.* at 101:11-14. About two hours later, Hudson approached Brown and told him, "Don't do it; he's married," apparently referring to Berber. *Id.* at 103:1-4. Brown again said, "Forget it." *Id.* at 103:12. Hudson replied, "That's a better play." *Id.* at 103:12-13. As to Hudson's account, Hudson did not describe this incident in detail, but briefly stated that Brown approached him a second time on December 15, 2021 and asked, "What's going on with the report?" Hudson Dep. 194. To which Hudson replied, "What report?" *Id.*

On December 15, 2021, Brown called Captain Paul Sallee and reported (again without describing any specifics) that there was a harassment issue that Hudson was not dealing with. *Id.*

4

at 107:10-22, 108:19-23.  Sallee told Brown to write the incident down.  *Id.* at 109:2-5.  Brown handwrote a statement to Sallee and left it at his desk.  *Id.* at 110:13-20, 111:4-18.  The statement described Brown's difficulty trying to make a harassment report with Hudson but did not describe the details of Berber's harassment or assault, or even mention Berber.  Llinas Decl. ¶ 22(a); [Docket No. 88-14 (Handwritten Statement)].  Brown's testimony is largely consistent with Sallee's testimony about this phone call, except that Sallee did not recall Brown complaining about Hudson.  [Docket No. 88-17 (Dep. Paul Sallee, April 1, 2024) 163-64.]

On December 16, 2021, Hudson asked Brown to come with him to see Captain Sallee.  First Brown Dep. 112:14-17.  According to Brown, on their way to the captain's office, Hudson told Brown he would cut the extra wiper job once the ship returned to Oakland.  *Id.* at 113:1-10.  Brown understood this to mean that Hudson had just cut his job on the ship, as Brown was the extra wiper.  *Id.* at 117:3-25.  In contrast, Hudson testified that Brown and Sallee had come to Hudson's office, and the three of them then walked to Sallee's office.  Hudson Dep. 195.  Neither Hudson nor Sallee testified about a conversation between Hudson and Brown about cutting the extra wiper job.  According to Brown, when they arrived in the captain's office, Brown requested that a different officer be present other than Hudson.  First Brown Dep. 113:11-19.  Sallee said, "Well, we could, but that'll take a lot of time."  *Id*.  Sallee presented Hudson and Brown with APL's printed-out sexual harassment paperwork, and then asked Brown what happened.  *Id.* at 114:1-10.  Brown reiterated that Berber was "coming on to" him, but did not detail the December 2, 2021 assault.  *Id.* at 114:11-115:17.  According to Sallee, when the three of them met in his office, Brown complained about how Hudson was handling his complaint, but did not give Sallee any reason to suspect that Hudson was someone Brown could not confide in.  Sallee Dep. 164-65.  Brown did not request a union delegate to be present at the meeting.  *Id.* at 173-74.  Sallee asked Brown what happened and took his written statement based on what he said.  *Id.*

The parties offer differing accounts of the results of the meeting.  According to Brown, Sallee concluded the meeting by saying that a sexual harassment report would be filed and would stay on the ship, and Brown's written statement would be destroyed.  First Brown Dep. 115:25-116:2.  Brown then asked for his statement back, but Sallee said he had lost it.  *Id.* at 116:3-11.  In

5

1  contrast, Sallee testified that Brown told him the matter was resolved without needing further
2  action and requested that Sallee destroy his statement.  Sallee Dep. 174, 180.
3      After the meeting, Brown reported the incident to Mark Remijian, the designated person
4  ashore, again not specifically describing the harassment or assault.  First Brown Dep. 129.  On
5  December 17, 2021, Alexander Reyer appeared to yell at Brown for reporting Berber and Hudson
6  to the designated person.  *Id*. at 146.  Brown told Reyer that Berber had been coming on to him,
7  but Reyer said he was mistaking Berber's "European charm" and called Brown a "paranoid
8  homophobe."  *Id.* at 147.
9      On December 18, 2021, Brown requested permission to disembark the ship in South
10 Korea.  First Brown Dep. 151:11-153:17.  Sallee did not allow Brown to disembark due to the
11 Korean quarantine law.  Sallee Dep. 226-27.  Brown had what he describes as a nervous
12 breakdown and took the day off.  First Brown Dep. 154:6-16.  Brown soon recovered and returned
13 to work.  *Id.* at 155:19-24.  A day after Brown returned to work, Abduladula attempted to prevent
14 Brown from doing his laundry in the sailor's laundry room, telling Brown to do his laundry on his
15 own deck.  *Id.* at 159:14-23.  For the rest of the trip, Brown was still required to participate in
16 muster meetings[3] in the control room with Berber twice a day.  Llinas Decl. ¶ 19; [Docket No. 88-
17 11 (Dep. Juan Carlos Roberts, April 8, 2024) at 84].
18     On January 2, 2022, Sallee called Brown to his office and told him that he would have to
19 take a psychological examination before making another voyage.  First Brown Dep. 160:19-
20 161:21.  Sallee cited Brown's breakdown in Korea and stated that Brown did not "fit the dynamic
21 of the ship."  *Id.*  The day before the ship arrived in Oakland, California, Brown informed Sallee
22 that he quit.  *Id.* at 165:12-19.  Brown disembarked on January 10, 2022 in Oakland.  Brown
23 Email Statement.

24 **II.   LEGAL STANDARD**
25    A court shall grant summary judgment "if . . . there is no genuine dispute as to any material
26 fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

---

[3] The Engine Department had muster meetings in the control room of the Wilson twice a day, and all Engine Department crewmembers were required to attend.  Roberts Dep. 77-78.

of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must view the evidence in the light most favorable to the non-moving party. *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248). The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist to support the non-moving party's claims. *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252). A showing that "there is some 'metaphysical doubt' as to the material facts as issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

As Brown is the non-moving party, the law requires the court to construe the facts in the light most favorable to Brown.

### III.   DISCUSSION

#### A.   Jones Act Negligence

Brown's first claim is for negligence under the Jones Act, 46 U.S.C. § 30104 et seq. Seamen's rights parallel those of railway employees under the Federal Employers' Liability Act

7

("FELA"), 45 U.S.C. § 51 et seq. § 30104. *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 662 n. 5 (9th Cir. 2009). Section 51 of the FELA provides, in relevant part, that "[e]very common carrier by railroad . . . shall be liable in damages . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."

With respect to intentional assault cases covered by the Jones Act, a shipowner may only be liable for a crewman's injuries under two theories of liability. First, if the assault was committed by the crewman's superior for the benefit of the ship's business, the shipowner is vicariously liable for the assault (also known as respondeat superior). *Lykes Bros. S.S. Co. v. Grubaugh*, 128 F.2d 387, 391 (5th Cir. 1942), *modified,* 130 F.2d 25 (5th Cir. 1942); *Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191, 195 (2d Cir. 1962). Second, the shipowner is directly liable for its own negligence if the assault was foreseeable and the ship's officers failed to prevent it. *Stechcon v. United States,* 439 F.2d 792, 793 (9th Cir. 1971); *see also Miles v. Melrose*, 882 F.2d 976, 983–84 (5th Cir. 1989), *aff'd sub nom. Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ("Establishing shipowner negligence in assault cases normally requires evidence supporting either of the following propositions: 1) that the assault was committed by the plaintiff's superior for the benefit of the ship's business, or 2) that the master or ship's officers failed to prevent the assault when it was foreseeable.").

As to the first theory of vicarious liability, Brown has not provided evidence that Berber was acting as Brown's superior at the time of the assault. Brown offers Hudson's testimony that Berber had a "higher rank" than Brown in the ship's hierarchy, and that Berber could request assistance from other crewmembers (including Brown) to perform tasks. Hudson Dep. 37:15-38:14. However, Hudson made clear that Berber was not authorized to give Brown instructions; only the first engineer or the chief engineer could assign tasks or redirect personnel. *Id*. at 35:6-13. Based on this record, a "higher rank" is not equivalent to supervisory authority on the ship for purposes of vicarious liability for negligence under the Jones Act. Moreover, nothing in the record suggests that Berber had requested Brown's assistance on a task or that Berber was supervising Brown in any way during the incidents of harassment and assault. "[T]he mere fact of

8

a superior position . . . is not the controlling question" in a Jones Act vicarious liability case. *Grubaugh*, 128 F.2d at 391. The plaintiff must show that the assailant was "exerting or attempting to exert any authority given him by the master over plaintiff, if, in fact and in law, he had any." *Id.* at 392. Brown fails to offer any evidence that Berber was exerting authority over Brown at the time of the assault or over the course of the harassment.

Plaintiff's remaining theory is for direct negligence—that Berber's assault was foreseeable and the ship's officers failed to prevent it. To prevail on a Jones Act direct negligence claim, a plaintiff must prove the following elements: "duty, breach, notice and causation." *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658, 662 (9th Cir. 1997) (citing *Havens v. F/T Polar Mist*, 995 F.2d 215, 218 (9th Cir. 1993)). To establish notice under the Jones Act, a plaintiff must demonstrate that "the employer or its agents either *knew* or *should have known* of the dangerous condition" at issue. *Ribitzki*, 111 F.3d at 663 (emphasis in original) (citing *Havens*, 996 F.2d at 218). A defendant may be "charged with constructive notice if, in the exercise of reasonable care, it ought to have known about or discovered the alleged dangerous condition[]" at issue. *Id.* As applied to intentional assault cases, "there must be a showing that the assailant is a person of known vicious character, or one who the employer should have known was a vicious character." *Offshore Logistics, Inc. v. Astro-Marine, Inc.*, 482 F.Supp.1119, 1121 (Ed. La. 1980) (citing *Schultz v. Evelyn Jewell, Inc.*, 476 F.2d 630 (5th Cir. 1973)). "The quantum of evidence necessary to support a finding of Jones Act negligence is less than that required for common law negligence . . . and even the slightest negligence is sufficient to sustain a finding of liability." *Havens*, 996 F.2d at 218; *see also Miles*, 882 F.2d at 984 ("A seaman in a Jones Act case has only a 'featherweight' burden of proof; he need prove only slight negligence, 'which can be accomplished by very little evidence.'").

APL argues that Plaintiff has not met his evidentiary burden to show that APL was on notice of the potential assault before it occurred. Brown responds that the assault was foreseeable because of the previous harassing incidents that occurred in the presence of other crewmates, such as Berber winking and puckering his lips at Brown. He also points to Hudson's deposition, in which Hudson admitted that he knew Berber had a "tendency to touch shoulders or maybe put a

hand on arm or on upper back or something, he'd stand very close." Hudson Dep. 171:1-4. Hudson had dismissed Berber's behavior as the result of cultural differences due to Berber coming from an Arab country, and the winking as an involuntary tic in his left eye. *Id.* at 170:16-171:12. Lastly, Brown asserts that APL failed to verify, for at least ten years prior to the subject incident, that crewmembers completed the required sexual harassment training modules. Opp'n 26.

A review of Jones Act assault cases provides helpful context. In *Miles v. Melrose*, the steward's assistant was stabbed to death by another crewmember. 882 F.2d at 980. The ship's chief steward (1) knew the attacker "was hostile, argumentative, and 'on something' immediately prior to the assault"; (2) knew the attacker "was belligerent and argumentative when he drank yet allowed him to do so"; and (3) allowed drinking on board the vessel despite the ship board rule prohibiting it. *Id.* at 984. The court found this was sufficient evidence to create a question for the jury as to whether the shipowner was liable for failing to prevent a foreseeable assault. *Id.* In *John v. Royal Caribbean Cruises, Ltd.,* No. 07-22766-CIV, 2008 WL 11407153, at *1 (S.D. Fla. Jan. 24, 2008), the court found that allegations of prior similar sexual assaults on Royal Caribbean's ships might be sufficient to prove foreseeability that the plaintiff, a Royal Caribbean employee, may be sexually assaulted on the ship, even if the prior incidents were unrelated to the plaintiff. And in *Hasty v. Trans Atlas Boats Inc*., 389 F.3d 510, 513 (5th Cir. 2004), the court found that allowing an intoxicated crewmember to board the ship in violation of the company's "zero-tolerance" alcohol policy may be sufficient to prove foreseeability that the crewmember posed a danger, even if the crewmember had never previously been violent while drunk.

In contrast, courts have found insufficient evidence of foreseeability in the following cases. In *Sloan v. United States*, 603 F. Supp. 2d 798 (E.D. Pa. 2009), the plaintiff alleged a racially motivated assault by a crewmember. The court found that the shipowner, American Overseas, was not liable for direct negligence because the plaintiff had produced no evidence that American Overseas knew that the assailant had any propensity toward violence. *Id.* Prior to the incident involving plaintiff, American Overseas had "not received any complaint concerning [the assailant] in matters involving racial prejudice, inappropriate conduct or work place violations," and was also "not put on notice regarding such tendencies by any of [the assailant's] previous employers."

*Id.* In *Fountain v. John E. Graham & Sons*, 833 F. Supp. 873, 879 (S.D. Ala. 1993), *aff'd sub nom. Fountain v. Graham & Sons*, 16 F.3d 1232 (11th Cir. 1994), the court found that the ship's captain could not have reasonably foreseen or prevented the assault where the plaintiff and the assailant had no previous problems despite being on the same watch most of the time, and where the assailant "exhibited no violent propensities and was not easily riled."

The court now examines Brown's evidence. It is undisputed that Brown did not report Berber's harassing conduct to his superiors before the December 2, 2021 assault. Brown cannot rely on Berber's specific interactions with Brown, such as making "sexual faces" at Brown, staring at his butt, and partially blocking his path on the ship, to impute notice on APL because there is no indication that any ship's officers (or anyone else for that matter) saw these incidents or should have been aware of them prior to the assault. Brown had a couple discussions with co-workers about Berber that pre-date the assault, but they were quite vague. Several days before the December 2, 2021 assault, Brown complained to his co-worker Mohammed Abduladula that Berber was winking at him. Later, during breakfast at the ship's Mess Hall, co-worker Alexander Reyer heard Brown yell an expletive without elaboration. There is no indication in the record that Reyer knew that Brown was cursing in response to Berber, who was sitting 10-15 feet away. In sum, the evidence shows that the only people who may have been aware of Brown's discomfort with Berber were Abduladula and Reyer, who were not Brown's supervisors,[4] and there is no evidence that these co-workers understood that Brown was uncomfortable because Berber was sexually harassing him.

As to Berber's tendency to "stand very close" to others and put a hand on their arms or backs, the general nature of this evidence is insufficient to put APL on notice of Berber's propensity to commit sexual assault. Brown offers no evidence to support a reasonable inference that this behavior could be characterized as sexual or inappropriate, and he does not explain how

---

[4] Brown attempts to argue that Abduladula and Reyer were Brown's supervisors, but his only evidence is that they were "higher ranked" than Brown in the ship's hierarchy. As discussed above, this is not sufficient evidence of supervisory authority. The record states that Brown's only supervisors were First Assistant Engineer Juan Carlos Roberts, Chief Engineer Paul Hudson, and Captain Paul Sallee. First Brown Dep. 36:3-6; Spann Decl. ¶ 11(a)-(b); Llinas Decl. 4(f), (k).

11

the behavior violates APL's policies and procedures.[5]

Finally, there is no evidence that APL failed to verify that its crewmembers completed sexual harassment training modules. Brown points to the deposition of John Dragone, APL's Director of Labor Relations during the relevant time period, who testified that he had no recollection of whether APL did any audits or verified that crewmembers were completing sexual harassment training. [Docket No. 88-5 (Dep. John Dragone, May 10, 2024) 54:9-20.] However, this testimony loses its relevance because Dragone also made clear that Mark Remijian was the APL executive responsible for auditing and verification, not himself; and that he had no direct knowledge of whether Remijian conducted such audits. *Id.* at 48-49, 54-55.

Similar to *Sloan*, 603 F. Supp. 2d 798, Plaintiff offers no evidence that APL knew about prior sexual harassment or assault incidents involving Berber, and it is undisputed that APL's records on Berber contain no history of disciplinary acts while he was an APL employee. [Docket No. 83 (Decl. Michael Labonte, May 23, 2024) ¶ 3.] The court concludes that Plaintiff has not met his burden to produce facts from which a reasonable juror could determine that the assault was foreseeable.

APL's motion for summary judgment on the Jones Act negligence claim is granted.

### B.     Unseaworthiness

Brown's second claim is for unseaworthiness. The doctrine of unseaworthiness requires a shipowner "to furnish a vessel and appurtenances reasonably fit for their intended use." *Faraola v. O'Neill*, 576 F.2d 1364, 1366 (9th Cir. 1978) (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)). The shipowner's duty is absolute; actual or constructive knowledge of the unseaworthy condition is not an element of liability. *Ribitzki*, 111 F.3d at 664 (citing *Mitchell*,

---

[5] Brown cites APL policy HRPC002, which provides that "Harassment may be present in a range of subtle and not-so-subtle behaviors. Generally, harassment, a) has the purpose or effect of creating an intimidating, hostile, or offensive work environment, b) has the purpose or effect of unreasonably interfering with an individual's work performance, or c) otherwise adversely effects an individual's employment opportunities." Llinas Decl. ¶ 14(e). Without more evidence to provide context and detail, a reasonable juror could not find that Berber's general behavior of standing close to people and touching them on their arms or backs constitutes harassment under this policy.

362 U.S. at 549).

"[T]he warranty of seaworthiness extends to the crew as well as the ship and [] the owner warrants that the crew, although not necessarily 'competent to meet all contingencies' is 'equal in disposition and seamanship to the ordinary men in the calling.'" *Peterson v. United States*, 224 F.2d 748, 750 (9th Cir. 1955) (quoting *Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 518 (2d Cir. 1952)). Courts ask whether the crew member's behavior was "within the usual and customary standards of the calling," or whether it was "a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature." *Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 1096 (C.D. Cal. 2015), *aff'd,* 694 F. App'x 585 (9th Cir. 2017) (quoting *Boudoin v. Lykes Bros. Steamship Co.*, 348 U.S. 336, 340 (1955)). A crewman's savage and vicious nature may be inferred from the nature of the assault or by evidence of prior vicious conduct. *See Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191, 193 (2d Cir. 1962). "A finding of seaworthiness is usually a finding of fact." *Mahnich v. S. S. S. Co.*, 321 U.S. 96, 98 (1944).

APL attempts to argue that Berber's assault was only a "brief moment of contact" and that it does not constitute evidence of Berber's "vicious nature." Reply 7-8. But Brown testified that Berber forcibly inserting his finger into Brown's anus, however briefly. As the court ruled in its order on Defendants' motion to dismiss [Docket No. 63], this could constitute rape. The nature of such an assault is well outside "the usual and customary standards of the calling." *See Russo*, 135 F. Supp. 3d at 1096. As such, Brown has raised a genuine issue of material fact as to whether Berber's assault violated the warranty of seaworthiness. The court denies summary judgment on this claim.

**C. Title VII Retaliation**

Brown also brings a Title VII retaliation claim.[6] Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

---

[6] The parties do not dispute that Title VII applies to this case.

13

under this subchapter.

42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of Title VII retaliation, the plaintiff must "adequately allege that: '(1) she engaged in an activity protected under Title VII; (2) her employer subjected her to adverse employment action; [and] (3) there was a causal link between the protected activity and the employer's action.'" *Kama v. Mayorkas*, 107 F.4th 1054, 1059 (9th Cir. 2024) (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986)). The plaintiff's evidentiary burden is low. *Id.* "If a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason for the challenged action.' . . . If such a reason is asserted, then the burden shifts back to the plaintiff to show that the asserted reason is merely a pretext for retaliation." *Id.* (quoting *Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023)).

The parties do not dispute that Brown engaged in protected activity by reporting sexual harassment to Hudson, Sallee, and Remijian. APL argues that Brown has not shown an adverse employment action or a causal link, and that the complained-of conduct had legitimate, non-discriminatory reasons. Brown offers five pieces of evidence supporting actionable retaliation:

1. Hudson told Brown not to file a sexual harassment report against Berber because Berber was married (First Brown Dep. 103);[7]
2. Hudson told Brown he was cutting Brown's job while they were walking to the captain's office to make the sexual harassment report (First Brown Dep. 117);
3. Reyer yelled at Brown for making a report to the designated person ashore, told Brown that he had mistaken Berber's "European charm," and called Brown a "paranoid homophobe" (First Brown Dep. 146-47);
4. Abduladula attempted to prevent Brown from doing his laundry in the sailor's laundry room (First Brown Dep. 159); and
5. Sallee told Brown he would have to take a psychological examination before making another voyage and stated that Brown did not "fit the dynamic of the ship" (First Brown Dep. 160-61).

The definition of adverse employment action for retaliation claims is broader than that

---

[7] In reply, APL objects to the evidence involving Hudson, claiming Brown never raised it before and that it would "impermissibly expand the claim" beyond the scope of the pleadings. Reply 8. APL's argument is untenable. This evidence was available to APL in discovery and is relevant to Brown's retaliation claim, which is clearly raised in the pleadings. Brown obviously is permitted to offer facts at summary judgment that were not pleaded in the complaint.

14

which applies to discrimination claims.  Brown need only show that the alleged retaliatory act "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The adverse employment action need not be severe.  *McAlindin v. Cnty. of San Diego*, 192 F.3d 1226, 1239 (9th Cir. 1999); *Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991) (the plaintiff "need not show that she was fired, demoted or suffered some financial loss as a result" of the employer's action to state a retaliation claim).  An adverse employment action can include "lateral transfers, unfavorable job references, and changes in work schedules."  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).  However, "normally petty slights, minor annoyances, and simple lack of good manners will not create such" adverse actions.  *White*, 548 U.S. at 68.  Brown's second and fifth points (Hudson telling Brown that his position will be cut from the next voyage, and Sallee telling Brown he will be required to take a psychological exam before the next voyage) constitute adverse employment actions because they rise above "petty slights" and could dissuade a reasonable worker from making or supporting a charge of harassment.  The third and fourth points are insufficient because "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action."  *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000).  It is unclear if Plaintiff is offering the first point as an adverse employment action or merely as evidence supporting his retaliation claim.  Regardless, Brown has produced sufficient evidence of an adverse employment action.

Brown has also presented facts from which a reasonable juror could find a causal link.  The causal link between the protected activity and the adverse employment action "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action."  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (citing *Jordan v. Clark,* 847 F.2d 1368, 1376 (9th Cir. 1988)).  According to Brown, Hudson told him he was cutting his job while they were en route to making the formal sexual harassment report, and Sallee told him that he would have to take a psychological examination within three weeks of Brown making his report to Sallee.  If Brown's account is believed, a reasonable juror could determine that the close timing of these events

15

establishes a causal link between the protected activity and the adverse actions.

As Brown has provided sufficient evidence to support a prima facie retaliation claim, the burden shifts to APL to articulate a legitimate nondiscriminatory reason for its decision. *Ray*, 217 F.3d at 1240. Relying on Hudson's testimony, APL argues that Brown's wiper job was always meant to be terminated when the ship returned to California, so Hudson was not cutting his job in retaliation for Brown's complaint about sexual harassment. According to Hudson, the extra wiper position was "one trip relief," meaning the expectation was that Brown's employment was only for the duration of one voyage, as opposed to a set 150 to 180 day rotation. Hudson Dep. 75:1-76:5. APL also argues that Sallee's statements to Brown regarding a psychological evaluation and that he "did not fit the dynamics of the ship" were motivated by concern for the health and safety of the crew after Brown's nervous breakdown in Korea, not because Brown made a sexual harassment report. Reply 10-13. If the jury believes APL's witnesses, these could constitute legitimate reasons for Hudson's and Sallee's conduct.

As APL only presented these arguments on reply, Brown did not have an opportunity to respond. However, Brown has raised sufficient evidence to create a genuine dispute of material fact as to whether APL's reasons are pretextual. "A plaintiff can establish pretext '(1) directly, by showing that unlawful discrimination more likely [than not] motivated the employer; [or] (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or via a combination of the[se] two kinds of evidence.'" *Kama*, 107 F.4th at 1059 (quoting *Opara*, 57 F.4th at 723). "When assessing the validity of an employer's stated reason for its actions, the key is not whether the reason is 'objectively false' or 'baseless' but whether the employer 'honestly believed its reasons for its actions.'" *Id.* (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002)).

Brown has offered enough evidence to call into question Hudson's and Sallee's motivations. Brown testified that Hudson had previously told him not to report Berber because Berber was married. Therefore, a reasonable juror could doubt Hudson's testimony that the extra wiper job was always intended to last for one trip only, and conclude that Hudson cut Brown's position in retaliation for Brown reporting Berber. Brown also testified that Sallee falsely stated

16

that he had lost Brown's handwritten statement when he had actually destroyed it, and Brown additionally argues that his nervous breakdown was caused in part by Sallee's failure to address his sexual harassment report. This could lead a juror to doubt Sallee's explanation that he was motivated only out of concern for Brown's mental health when he required Brown to take a psychological evaluation.

Brown has raised sufficient evidence to create a genuine dispute whether he suffered retaliation after reporting sexual harassment. APL's motion for summary judgment on the Title VII retaliation claim is denied.

### D. IIED

Brown brings a tort claim for intentional infliction of emotional distress (IIED). The Ninth Circuit applies the Restatement (Second) of Torts to evaluate claims for IIED under maritime law. *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 841 (9th Cir. 2002). Section 46 of the Restatement states in relevant part: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Comment d elaborates:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Wallis*, 306 F.3d at 842 (emphasis in original) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

"'General maritime law recognizes typical respondeat superior principles,' under which a principal may be held vicariously liable for the torts of its agent acting within the scope of employment." *Garcia v. Vitus Energy, LLC*, 605 F. Supp. 3d 1188, 1212 (D. Alaska 2022) (citing *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1234 (11th Cir. 2014)). The "traditional

17

rule" is that an employee's actions are within the scope of employment "only if motivated, in whole or part, by a desire to serve the employer's interests." *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010); *see also Stoot v. D & D Catering Serv., Inc.*, 807 F.2d 1197, 1200 (5th Cir. 1987) (finding that, under maritime law, assault was outside scope of employment when motivated by "anger and revenge following [the victim's] personal profane statement" rather than for reasons related to employment). Recent maritime cases in this circuit have applied the Restatement (Third) of Agency to evaluate the shipowner's vicarious liability. *See, e.g., Garcia*, 605 F. Supp. 3d 1188; *Espinoza v. Princess Cruise Lines, Ltd.*, 581 F. Supp. 3d 1201 (C.D. Cal. 2022). The Restatement (Third) of Agency § 7.07 defines the scope of employment:

> An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

Brown's opposition does not clearly explain the legal standard he is using to support his IIED claim against APL. Instead, he focuses on five pieces of evidence:

> 1) Berber's "relentless and damaging physical advances of a sexual nature" from November 25, 2021 through December 2, 2021;
> 2) Berber's "continually harassing and victimizing Plaintiff in front of" Abdulalah at the Coffee Room;
> 3) Berber's "continually harassing and victimizing Plaintiff in front of" Reyer at the ship's mess hall;
> 4) Berber's "committing an aggravated sexual battery" on Plaintiff on December 2, 2021;
> 5) reporting the incidents to Hudson, Sallee, and Remijian, who "failed to act and continue to force Plaintiff to work alongside" Berber.

Opp'n 39. Although Brown did not make this clear, he appears to be raising a vicarious liability claim against APL for the conduct of Berber as well as the conduct of Hudson, Sallee, and Remijian.

APL argues that it cannot be held vicariously liable for Berber's acts because his tortious conduct was not within the scope of his employment with APL. Mot. 16. The court agrees. At oral argument, Brown argued that Berber's assault was within the scope of his employment because it occurred while he was on duty. The "general rule" of vicarious liability is that sexual

18

1   harassment is not within the scope of employment, regardless of whether the assailant was on duty

2   or not. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 757 (1998). This is because sexual

3   harassment is typically "for personal motives, motives unrelated and even antithetical to the

4   objectives of the employer." *Id.* Brown offers no argument that Berber assaulted him for motives

5   related to his employment. Berber's conduct does not support Brown's IIED claim against APL.

6         Plaintiff's last piece of evidence involves conduct by supervisors Hudson, Sallee, and

7   Remijian. APL does not dispute that these three employees were acting within the scope of their

8   employment when responding (or failing to respond) to Brown's harassment complaint. Instead,

9   APL argues that their conduct was not extreme or outrageous.

10        The conduct of Hudson, Sallee, and Remijian does not meet the standard for IIED

11  culpability. While Brown offered evidence that his supervisors required him to be in the same

12  room with Berber at least twice a day during muster meetings, this does not amount to "extreme or

13  outrageous" conduct, especially where there is no evidence that Brown ever reported to his

14  superiors that Berber sexually assaulted him.[8] The content of Brown's sexual harassment

15  complaint was vague and non-specific. Brown does not offer evidence that he had to interact with

16  or work directly with Berber after the supervisors were notified. Brown also does not state that

17  Berber ever harassed him again. In sum, viewing the evidence in the light most favorable to

18  Brown, it does not show that Hudson, Sallee, or Remijian engaged in conduct that could be

19  characterized as extreme or outrageous.

20        APL's motion for summary judgment as to the IIED claim is granted.

21  **E.    NIED**

22        APL moves for summary judgment on Brown's claim of negligent infliction of emotion

---

[8] The sole case cited by Brown is easily distinguished. In *Hayes v. TJX Companies, Inc.,* 2018 WL 619876 (C.D. Cal. 2018), the court adjudicated a motion for remand and found that plaintiff had not fraudulently joined a non-diverse defendant. In reviewing her allegations at the pleading stage (as opposed to summary judgment), the court found that the plaintiff had stated a plausible if "slight" IIED claim where she alleged a hostile work environment and that her supervisor gave her "ultimatums that made her choose between her job or her speedy recovery from her sensitive surgery, which the [supervisor] had notice of." The *Hayes* court emphasized that it was a "marginal case," particularly because of its procedural posture as a motion to remand involving fraudulent joinder.

distress (NIED).  Mot. 17.  Brown failed to address NIED in his opposition, thereby conceding the claim.  *See, e.g., Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 fn. 4 (9th Cir. 2005) (finding that failure to raise claims in opposition was abandonment of those claims).

## IV.     CONCLUSION

APL's motion for summary judgment is granted as to the Jones Act negligence, IIED, and NIED claims.  It is denied as to the unseaworthiness and Title VII retaliation claims.

**IT IS SO ORDERED.**

Dated: October 28, 2024

_____
Donna M. Ryu
Chief Magistrate Judge